**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

AUBREY MARSHALL, DAVID        )
WALKER, RICKY LEE JONES, JR., )
AUTWAIN WORTHY, AND APRIL     )
ADAMS,                        )
                              )
              Plaintiffs,     )            1:19CV986
                              )
      v.                      )
                              )
C & S RAIL SERVICES, LLC, JACK )
WILSON, DUSTIN WILSON, and     )
JASON WILSON,                  )
                              )
              Defendants.     )

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion for Partial Dismissal [Doc. #14]

by Defendants C&S Rail Services, LLC ("C&S" or the "Company") and Jack

Wilson, Dustin Wilson, and Jason Wilson (the "Wilson Defendants") pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons explained

below, the motion is granted in part and denied in part.

I.

For purposes of Defendants' motion to dismiss, the facts alleged in the

Complaint are construed in the light most favorable to Plaintiffs and all reasonable

inferences are drawn in their favor. U.S. ex rel. Oberg v. Pa. Higher Educ.

Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  Plaintiffs Aubrey

Marshall, David Walker, Ricky Lee Jones, Jr., Autwain Worthy, and April Adams

are African-Americans who were employed at all relevant times by C&S, a railroad

servicing business owned by the Wilson Defendants. (Compl. Introduction, ¶¶ 1-6, 10, 14, 27, 36, 66 [Doc. #1].) Their employment, they allege, ended when they were either terminated or chose not to return to work out of fear for their lives after superiors failed to address the racism Plaintiffs experienced at work.

The Company's Caucasian employees are alleged to have subjected African-American employees, including Plaintiffs at times, to threats of violence, racial slurs, derogatory comments, differential treatment, and unreasonable demands based on the employees' race, (e.g., id. ¶¶ 83, 87, 88), while the Wilson Defendants are alleged to have encouraged, assisted with, and condoned this conduct, (id. ¶ 83). The Wilson Defendants are also alleged upon information and belief to have set policies and practices related to the Company's compensation structure and termination of employees. (Id. ¶¶ 44, 62.)

### A.

Aubrey Marshall was a Field Manager for C&S from December 15, 2017 to June 2018, having received a raise in his annual salary from $54,000 to $60,000 in May 2018 for successfully executing his duties. (Id. ¶¶ 10-11.) Because of his job responsibilities, he traveled to worksite locations along the Eastern seaboard supervising approximately twenty employees who performed railroad services and repair contract services. (Id. ¶¶ 10, 12.) His crews were made up mostly of African-Americans, a segregation practice that made him uncomfortable and about which he questioned Company management. (Id. ¶ 13.) In early May 2018, C&S sent Marshall to work with a mostly white crew in New York, and he repeatedly

2

told Operations Manager Tim Ritter that he was uncomfortable with the racial segregation of employees. (Id. ¶¶ 14-16.)

That same month, Dustin Wilson and Ritter instructed Marshall to fire an African-American employee because he did not have clearance from the railroad board for eRailSafe, yet Ritter told Marshall not to fire David Skeens, a Caucasian employee, even though he also did not have clearance for eRailSafe. (Id. ¶ 14.)

Marshall and Ritter continued to interact in May when Marshall complained that Rueben Hensley, a Caucasian employee, was insubordinate, called him "'a big dummy'", and "used other racially offensive language" directed towards Marshall. (Id. ¶ 17.) Five days later, Marshall met with "Company owner Wilson" and Ritter and told them he felt the Company was racist because it had not addressed his complaints about Hensley's conduct. (Id. ¶ 18.) Upon information and belief, "Wilson" and Ritter refused to remediate the Company's racist conduct towards its African-American employees. (Id.)

Hensley's behavior toward Marshall had not changed when Marshall called him several times on May 24 to check on the worksite and Hensley made derogatory comments and hung up each time. (Id. ¶ 19.) Marshall again reported Hensley's behavior to Ritter who said he would take care of the situation, but upon information and belief, did not do so, as evidenced by Hensley's bragging that C&S management gave his family a vacation and free motel stay. (Id. ¶¶ 19-20.)

Not long afterwards, on May 30, Marshall received a telephone call from David Walker, the only African-American employee on Marshall's New York crew,

3

reporting that his coworkers told him they were going to hang him from a tree. (Id. ¶ 21.) Marshall informed Ritter, and within minutes Hensley texted Marshall, "can we go on a nigger hanging spree". (Id. ¶ 22 (citing Ex. 1 to Compl.).) Marshall told Ritter that neither he nor other African-American members of his crew felt safe coming to work, and he asked the Company to take steps so that he could return. (Id. ¶ 23.) C&S and "the individual Wilson Defendants" failed to take action and, fearing for his life and that of his crew members, Marshall did not return to work, and in retaliation C&S did not pay him for all the hours he had worked. (Id. ¶¶ 24-25.) Meanwhile, Hensley is still employed with the Company and upon information and belief was promoted into Marshall's position. (Id. ¶ 26.)

B.

David Walker was employed as a Laborer for C&S from April to June 2018 earning approximately $13 per hour. (Id. ¶ 27.) While working on Marshall's crew in New York in May 2018, Walker's Caucasian crewmembers repeatedly referred to him using racially derogatory terms like "'boy'" and "'you-n'". (Id. ¶ 28.) One coworker, "Stevo", refused Walker's help and told him "'your kind is always beneath me'". (Id. ¶ 29.) The following day, while Walker was in a truck with two Caucasian coworkers, one of them said, "'We are going to have a David Walker hanging today'" and "'We are going to hang David today.'" (Id. ¶ 30.) Upon information and belief, this racial hostility was tolerated by Skeens who supervised these employees. (Id. ¶ 33.) As noted above, Walker reported this threat and his fear to Marshall. (Id. ¶ 31.) Like Marshall, Walker did not feel safe returning to

4

work after Ritter, "the Wilson Defendants", and C&S managers failed to take immediate action to protect the African-American employees. (Id. ¶¶ 34-35.)

C.

Marshall also worked with Rickey Lee Jones, Jr., whom he hired in February 2018 to work on his crew in Georgia as a dump truck driver for $15 to $17 per hour. (Id. ¶¶ 36-37.)  Ritter told Jones that Marshall should not have hired him and that he did not like either of them. (Id. ¶ 39.)  Ritter "repeatedly cursed at", "spoke harshly to", and "made unreasonable demands" of Jones such as when he told Jones to get his "'ass'" in the truck and travel from Kentucky to Tennessee or be fired, even though Ritter knew the truck was faulty and without working lights. (Id. ¶ 40.)  Upon information and belief, Ritter did not direct similar offensive language and unreasonable demands towards Caucasian employees. (Id.)

After Marshall left C&S, Jones was supervised by Dylan Cox, a Caucasian employee, who spoke about Marshall in a "derogatory manner", leading Jones to complain about Cox's unprofessionalism. (Id. ¶ 49.)  Cox also made Jones do extra work without pay after Cox and Dustin Gambles, a Caucasian dump truck driver, would go out drinking and gambling. (Id. ¶¶ 38, 42.)  After Gambles told Jones in July 2018 that he wanted Jones's dump truck which had air conditioning, C&S managers told Jones they needed to fix his truck, gave it to Gambles, and provided Jones with a "'new'" 1998 model truck without air conditioning that leaked asphalt. (Id. ¶ 43.)  The Company repeatedly denied him proper equipment while providing it to Caucasian employees. (Id. ¶ 47.)

5

And, on information and belief, Gambles was paid over $20 per hour despite having less experience than Jones. (Id. ¶ 44.) When Jones asked for a raise, C&S managers ignored his request and asked him to drive a riskier and more difficult combination trailer and truck. (Id. ¶ 45.) Jones alleges that, upon information and belief, C&S has a pattern and practice of underpaying African-Americans for the same or similar jobs as Caucasian employees. (Id. ¶ 44.)

When Jones was the only African-American employee on Cox's crew, the other employees – who did not have a commercial driver's license ("CDL") – repeatedly told Jones – who did have a CDL – what to do and questioned his credentials. (Id. ¶ 47.)

Jones was also supervised at some point by Cody Lord. (Id. ¶ 48.) Lord's crew was young, white men, many of whom used racist language. They called Jones "'you-n'" and referred to "'your kind'". (Id.) Jones complained to C&S management about his Caucasian co-workers' language, habits, and avoiding work duties. (Id. ¶ 50.) Upon information belief, Ritter said he would teach Jones a lesson for trying to go by the book and/or opposing the Company's and managers' racist treatment and disparate practices. (Id. ¶ 51.) C&S fired Jones in July 2018. (Id.) Meanwhile, on information and belief, the Company made Gambles a supervisor. (Id. ¶ 52.)

D.

Autwain Worthy worked for C&S on and off over five years as a driver, laborer, and ground foreman and was paid approximately $12.50 per hour. (Id.

6

¶ 53.) Adams and Marshall supervised Worthy, "and he noticed that C&S placed all African American employees together and segregated the Caucasian employees on different teams." (Id. ¶ 54.) He trained at least five Caucasian employees who frequently refused to follow his orders or show him respect because of his race, treatment that was observed by Jones. (Id. ¶¶ 41, 55.) Those employees were then moved into all-white crews. (Id. ¶ 55.)

Worthy also heard racist comments such as when Caucasian employees, including Skeens, referred to him and other African-American employees as "'boy'" and "'you-n'" and cursed at and used harsh and abusive language towards them. (Id. ¶¶ 56, 57.) Worthy observed C&S treat Caucasian employees differently than African-Americans such as when Caucasian employees were allowed to go to a nearby store to use the restroom while supervisors discouraged African-American employees from leaving the job site. (Id. ¶ 57.) "Defendants and their supervisors" treated Worthy far worse than Caucasian employees, and Worthy complained about the segregation and treatment but nothing was done. (Id. ¶¶ 58, 59.)

At some point, Worthy had an accident on the job in a faulty truck, after having been accident-free for fifteen years. (Id. ¶ 60.) Upon information and belief, C&S managers knew the truck needed maintenance and was not fully inspected but assigned it to Worthy anyway. (Id. ¶ 61.) In response to the accident, C&S managers "incorrectly claimed Worthy had not had the authority to use the vehicle." (Id.) Worthy was fired following the accident, yet on information and belief "C&S did not fire Caucasian employees who had accidents." (Id. ¶ 62.)

Case 1:19-cv-00986-NCT-JEP   Document 22   Filed 04/09/21   Page 7 of 41

Worthy claims to have been fired "as a direct result of the Company's pattern and practice of firing African American employees for incidents for which Defendants do not fire Caucasian employees and because he complained about racist treatment and actions." (Id. ¶ 63.) Upon information and belief, if Worthy were Caucasian, he would still have his job. (Id. ¶ 64.)

E.

April Adams worked for C&S and its predecessor for seventeen years as a dump truck driver and manager. (Id. ¶ 66.) She was paid $12 per hour as a driver and $15 to $18 per hour as a manager, but upon information and belief was paid far less than all other Caucasian male managers because of her race despite her similar or greater experience and responsibilities. (Id. ¶¶ 66, 67, 69.) She was also treated differently as a manager because of her race when she was excluded from manager meetings and company retreats. (Id. ¶ 72.) As did other Plaintiffs, she objected to having to supervise employees in a racially segregated environment and to the Company's treatment of its African-American employees. (Id. ¶¶ 67, 68.)

In February 2018, two African-American employees Adams supervised called her to report that they had received threats at home that they would be hanged and did not feel safe returning to work. (Id. ¶ 70.) Adams called Dustin Wilson to report the threats, after which he terminated the job assignment of the African-American employees and replaced them with a Caucasian crew supervised by Skeens. (Id.)

8

At some point, the Company instructed Adams to send to New York an African-American crew whom Dustin Wilson had told would receive an extra $300 for making the trip only to deny them the compensation later. (Id. ¶ 71.) In response to Adams' complaint about the matter, Jason Wilson said the Company did not have to follow through on its promise. (Id.) Yet, upon information and belief, neither Dustin Wilson nor Jason Wilson denied Caucasian employees their promised compensation. (Id.)

As a result of the racist work environment, Adams experienced a serious health condition that required her to take medical leave. (Id. ¶ 73.) Upon information and belief, Company executives knew the threats to hang the African-American employees caused Adams significant distress and required her to take leave under the Family and Medical Leave Act ("FMLA"), and they were angry at Adams for opposing this treatment and for taking FMLA leave to deal with it. (Id. ¶¶ 77, 78.) C&S could have extended her "unpaid" "non-FMLA leave" per Company policy but refused to do so. (Id. ¶¶ 75, 76.) Upon information and belief, C&S routinely extended unpaid leave for other employees. (Id. ¶ 75.) The Company also refused to reemploy her in the same or another position following her leave because it was actively trying to get rid of her because she complained about and opposed its racist conduct. (Id. ¶ 76.) C&S terminated Adams once it claimed her FMLA leave had expired, allegedly in retaliation for exercising her rights under FMLA and opposing "the Company's unlawfully racist conduct." (Id. ¶¶ 74,

9

79.)  Upon information and belief, she was replaced by a Caucasian employee. (Id. ¶ 80.)

F.

Plaintiffs also allege that other African-American employees "were treated in a similarly racist and hostile manner." (Id. ¶ 81.)  "During an altercation among C&S rail employees, a Caucasian dump truck driver, C.J., used the 'n' word and a physical fight ensued", but upon information and belief C.J. was neither removed from the crew nor disciplined. (Id. ¶ 46.)  David Warren, a Caucasian, "called African American employees the n-word and other racist terms and put African American-themed paraphernalia with the belongings of African American employees." (Id. ¶ 81.)  On information and belief, Warren's conduct caused at least one African-American employee to quit. (Id. ¶ 82.)

II.

All Plaintiffs allege that all Defendants violated 42 U.S.C. § 1981 (first, third, fourth, and fifth claims for relief) and assert a claim of negligent retention and supervision against the Wilson Defendants (seventh claim for relief).  Jones, Worthy, and Adams allege C&S wrongfully discharged them (second claim for relief).  Marshall alleges all Defendants violated the North Carolina Wage and Hour Act (sixth claim for relief).  And, Adams alleges C&S violated the FMLA (eighth claim for relief).

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants first move to dismiss all claims against the Wilson Defendants.  They also move to

10

dismiss the first claim for relief asserting a general violation of 42 U.S.C. § 1981, the fourth claim for relief alleging disparate treatment in violation of § 1981 as to Worthy, and the fifth claim for relief asserting retaliation in violation of § 1981 as to Walker, Worthy, and Adams. Defendants also move to dismiss the wrongful discharge claim and the FMLA claim.

III.

To survive a motion to dismiss made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). When evaluating whether the complaint

11

states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg, 745 F.3d at 136. Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

A.

Plaintiffs allege that C&S and the Wilson Defendants violated 42 U.S.C. § 1981. However, the Wilson Defendants argue that the allegations are insufficient to state a § 1981 claim against them. (Br. in Supp. of Defs.' Mot. for Partial Dismissal ("Br. in Supp.") at 9-12 [Doc. #15].) They assert there are no allegations of individual action by Jack Wilson and the only allegation of individual action by Jason Wilson is his statement about not following through on a promise to pay non-Plaintiff African-American employees. (Id. at 10.) They also contend that none of the alleged actions of Dustin[1] Wilson were directed toward any Plaintiff. (Id. at 10-11.) And, they argue that the allegations against the "Wilson Defendants" are conclusory and generic. (Id. at 11-12.) Plaintiffs respond that "[t]he Complaint is replete with allegations that the owners and operators of C&S, i.e., the Wilson Defendants, individually and specifically directly engaged in or

---

[1] Defendants appear to have made two typographical errors on page 11 of their brief, referring to "Justin" and "Jason" rather than Dustin. (See Br. in Supp. at 11.)

authorized actions" that violated § 1981. (Pls.' Opp'n to Defs.' Mot. for Partial

Dismissal ("Pls.' Opp'n") at 5 [Doc. #18].)

> Title 42 U.S.C. § 1981 provides that
>
> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subjected to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 "guards generally against race-based discrimination in the

workplace." Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399 (4th Cir. 2021). "A

§ 1981 action" is "founded on purposeful, racially discriminatory actions." Spriggs

v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999). In other words,

"§ 1981 can be violated only by intentional discrimination". General Bldg.

Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982).

Plaintiffs allege the Wilson Defendants subjected them generally to race

discrimination and more specifically to a hostile work environment, disparate

treatment, and retaliation – all in violation of § 1981. A racially hostile work

environment is one where unwelcome conduct that is based on the plaintiff's race

is "sufficiently severe or pervasive to alter the conditions of employment and

create an abusive atmosphere." Spriggs, 242 F.3d at 183-84 (noting that the

elements of a hostile work environment claim are the same under § 1981 and Title

VII). "Disparate treatment occurs 'when an employer treats certain people less

favorably than others on the basis of . . . race.'" Bateman v. Am. Airlines, Inc.,

13

614 F. Supp. 2d 660, 673-74 (E.D. Va. 2009) (quoting Carter v. Ball, 33 F.3d 450, 456 n.7 (4th Cir. 1994)). And, a plaintiff suffers retaliation in violation of § 1981 when he engages in protected activity, his employer takes adverse action against him, and a causal connection exists between the protected activity and adverse action. See Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 258 (4th Cir. 1998) (analyzing Title VII retaliation claim); Boyer-Liberto v. Fontainbleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (recognizing that the elements of a Title VII retaliation claim are the same as a § 1981 retaliation claim).

But a claim for individual liability under § 1981 "must be predicated on the actor's personal involvement." Hawthorne v. Va. State Univ., 568 F. App'x 203, 204-05 (4th Cir. 2014) (unpublished) (quoting Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000)). Section 1981 "imposes liability on an individual only for his or her own intentional actions that caused an infringement of section 1981." Benjamin v. Sparks, 173 F. Supp. 3d 272, 283 (E.D.N.C. 2016). No Plaintiff here sufficiently alleges any specific Wilson Defendant intentionally discriminated against him or her.

1.

Marshall alleges that Dustin Wilson (and Ritter) instructed him to fire an African-American employee who did not have eRailSafe clearance from the railroad board, but that it was Ritter who told him not to fire a similarly situated Caucasian employee. (Compl. ¶ 14.) Nothing about this allegation plausibly supports intentional discrimination by Dustin Wilson towards Marshall that infringes on

14

§ 1981. Marshall also alleges that he met with "Company owner Wilson" (and Ritter) to tell them that he felt the Company was racist because it had failed to address Hensley's conduct, and upon information and belief "Wilson" and Ritter failed and refused to remediate "the Company's unlawful and racist conduct toward its African American employees." (Id. ¶ 18.) Marshal does not identify which of the three Wilson Defendants – all of whom are alleged to own C&S – is "Company owner Wilson" or is "Wilson". Even had he done so, he states no facts to support his belief that "Wilson" and Ritter refused to act. Furthermore, the conduct the Company, upon information and belief, failed to address was Hensley's insubordination and calling Marshall "'a big dummy, and other racially offensive language", (id. ¶ 17), insufficient allegations to state a plausible claim of intentional discrimination towards Marshall. He also alleges that he reported to Ritter that he and other African-American crew members were not safe coming to work after receiving threats of hangings, (id. ¶¶ 21-23), and that "[t]he Company, as well as the individual Wilson Defendants, failed to take action to protect their African American employees" resulting in Marshall's decision not to return to work, (id. ¶ 24). But, he does not allege that any of the Wilson Defendants, much less which specific Wilson Defendants, were made aware of these threats or of Marshall's insecurity in returning to work. In sum, Marshall has not sufficiently alleged that any of the Wilson Defendants violated § 1981.

2.

The same is true for Walker.  He alleges that he complained to Marshall about the Caucasian workers' threats to hang him and his fear, but Marshall is not alleged to have reported these threats to any specific Wilson Defendant. (Id. ¶¶ 22, 23, 31.)  He also alleges that upon information and belief Skeens tolerated the Caucasian workers' behavior, but even if facts were alleged to support Walker's belief about Skeens, there is no allegation that any specific Wilson Defendant knew anything about Skeens in these circumstances. (Id. ¶ 33, 34.) And, he alleges that "the Wilson Defendants" and C&S managers "failed to take action to protect" him so he did not feel safe returning to work, but he does not identify an individual Wilson Defendant. (Id. ¶ 35.)  In sum, he has not alleged that any specific Wilson Defendant intentionally discriminated against him in violation of § 1981.

3.

 Neither has Jones who alleges that "[u]pon information and belief, the individual Wilson Defendants control and set the policy and practices relating to C&S compensation structure", upon information and belief he was paid $16 or $17 per hour despite being more experienced than Gambles who was paid over $20 per hour for the same job, and C&S managers ignored his request for a raise. (Id. ¶¶ 36, 44, 45.)  But, he does not allege what the compensation structure was or that any of the Wilson Defendants, much less a specific one, decided his or Gambles' pay.

16

4.

Worthy has also failed to allege sufficiently that any Wilson Defendant intentionally discriminated against him in violation of § 1981. He alleges that "Defendants and their supervisors treated [him] far worse than Caucasian employees and set the example for other employees to mistreat him", but he does not allege that any specific Wilson Defendant did anything to him. (Id. ¶ 58.) He alleges to have been fired for having an accident, when on information and belief Caucasian employees have not been, and that "[u]pon information and belief, the individual Wilson Defendants had control over and were responsible for setting the policies and practices of the Company relating to the termination of employees". (Id. ¶¶ 62, 63.) But, there are no facts alleged in support of Worthy's belief that Caucasian employees who had accidents were not fired or his belief that the Wilson Defendants set termination policy. There is also no allegation of the content of the Company's termination policy much less that any specific Wilson Defendant had anything to do with Worthy's termination.

5.

Adams has also failed to allege sufficiently that any Wilson Defendant intentionally discriminated against her in violation of § 1981. She alleges that after she reported to Dustin threats of hangings made to two of her African-American crewmembers that he terminated the job assignments of the African-Americans and replaced them with a Caucasian crew led by Skeen. (Id. ¶ 70.) This is not intentional discrimination by Dustin against Adams. She also alleges that Dustin

17

told African-American employees they would receive an additional $300 for making the trip to New York to work, but "Wilson" denied them the compensation upon arrival. (Id. ¶ 71.) Adams complained, and Jason said the Company did not have to follow through on its promises. (Id.) This, too, does not show intentional discrimination by Dustin or Jason towards Adams. Adams also alleges upon information and belief that she was paid less than Caucasian male employees, and elsewhere in the Complaint, Jones alleges that "[u]pon information and belief, the individual Wilson Defendants control and set the policy and practices relating to C & S compensation structure." (Id. ¶¶ 44, 66, 67, 69.) Yet, there are no facts to support her belief that she was paid less than Caucasian managers and similarly situated employees. There is also no allegation as to what the compensation structure was or that any of the Wilson Defendants, much less a specific one, decided Adams' pay.

                                        6.

        Plaintiffs argue that they "plausibly alleged that the Wilson Defendants had the authority to and in fact did set and enforce C&S's discriminatory policies and practices that injured Plaintiffs." (Pls.' Opp'n at 13.) In support of this proposition, they cite Alexander v. City of Greensboro, 762 F. Supp. 2d 764 (M.D.N.C. 2011), and Carson v. Giant Food, Inc., 187 F. Supp. 2d 462 (D. Md. 2002), but neither successfully advances their position. Plaintiffs cite a portion of Alexander that not only discusses a contractual challenge the Wilson Defendants do not make, but also describes the failings of portions of the "shotgun" complaint that allege "an

                                        18

array of generalized grievances" that "are clearly inadequate" and states that "[e]ach Plaintiff must . . . allege facts plausibly supporting" the elements of a § 1981 claim. (Pls.' Opp'n at 13 (citing Alexander, 762 F. Supp. 2d at 790-92).) The quoted language Plaintiffs attribute to Carson is actually from Benjamin, 173 F. Supp. 3d at 283, and that court repeatedly stated that individual liability under § 1981 has to be predicated on the individual's own intentional actions. Carson, cited by the Benjamin court, also supports this proposition. There, the court granted summary judgment on the § 1981 claims against the individual defendants because Plaintiffs "only alleged that the individual defendants were aware of racial problems and graffiti in the workplace after they occurred and did not respond properly" and there was "no evidence that any of the individual defendants directed, participated in or even approved of intentional discrimination." 187 F. Supp. 2d at 483-84. Here, Plaintiffs' general allegations that "[u]pon information and belief, the individual Wilson Defendants control and set the policy and practices relating to C&S compensation structure" and "had control over and were responsible for setting the policies and practices of the Company relating to the termination of employees" are insufficient.

Plaintiffs also argue that they "have plausibly alleged that the Wilson Defendants had personal involvement in enforcing the discriminatory policies." (Pls.' Opp'n at 14 (citing to Compl. ¶¶ 14, 70, 71).) None of the allegations they cite involve any actions taken against any Plaintiff. (See Compl. ¶ 14 (alleging Dustin directed that an African-American employee be fired for not having a

19

specific certification), ¶ 70 (alleging "Mr. Wilson" terminated the job assignment of African-Americans after Adams complained that certain employees had been threatened with lynching), ¶ 71 (alleging that Dustin and Jason denied African-American employees promised compensation).) See Alexander, 762 F. Supp. 2d at 791 ("Even where the Amended Complain names specific victims of the alleged discrimination, they are not always Plaintiffs. For example, the Amended Complaint alleges that Wray excluded two black Assistant Chiefs . . . from 'the decision-making process.' Neither is a Plaintiff, however. Allegations like these do not show that any individual Plaintiff is entitled to relief.")

Plaintiffs also argue that they have "alleged that the Wilson Defendants were aware of and failed to remediate the racist conduct of C&S and its employees" and the "court can infer that the individual Defendants approved of or ratified the intentional discrimination by their failure to act". (Pls.' Opp'n at 15 (citing Dawson v. Washington Gas Light Co., No. 1:18-cv-971, 2019 WL 692803, at *4 (E.D. Va. Feb. 19, 2019). Not only is Dawson an unpublished district court opinion, but its facts are distinguishable from these, most evidently because of the allegations of intentional acts against the plaintiff himself.

In sum, no Plaintiff has sufficiently alleged that Jack Wilson, Jason Wilson, or Dustin Wilson violated § 1981.

B.

Marshall alleges that C&S and the Wilson Defendants violated the North Carolina Wage and Hour Act ("NCWHA") when they failed to pay him for all of the

20

hours he had worked after he did not return to work. The Wilson Defendants move to dismiss this claim against them because, as they argue, none of them is Marshall's employer. (Br. in Supp. at 12-14.) They contend that the lack of allegations "that any Wilson Defendant was <u>in any way</u> involved in the decision to not pay Marshall the wages about which he complains" dooms the claim. (<u>Id.</u> at 13.) Marshall responds that this is too narrow a reading of the definition of employer under the NCWHA. (Pls.' Opp'n at 16-17.)

It comes as no surprise that employers are required to pay employees, including those who have separated from employment for any reason, their earned wages, and an employer who fails to do so is liable to the employee. <u>See, e.g.</u>, N.C. Gen. Stat. §§ 95-25.6, 95-25.7, 95-25.22. The question here is who is an employer? An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee", N.C. Gen. Stat. § 95-25.2, and includes individuals and businesses, among others, N.C. Gen. Stat. § 95-25.2(11). Because "the NCWHA is modeled after the FLSA", "North Carolina courts look to the FLSA for guidance" for, among other things, how to determine if a person is an employer. <u>Powell v. P2Enterprises, LLC</u>, 786 S.E.2d 798, 800 (N.C. Ct. App. 2016) (quoting <u>Hyman v. Efficiency, Inc.</u>, 605 S.E.2d 254, 257 (N.C. Ct. App. 2004) & <u>Garcia v. Frog Island Seafood, Inc.</u>, 644 F. Supp. 2d 696, 707 (E.D.N.C. 2009)). The United States Supreme Court has described the statutory definition of "employer" as "expansive". <u>Powell</u>, 786 S.E.2d at 801 (quoting <u>Falk v. Brennan</u>, 414 U.S. 190, 195 (1973)). Nevertheless, it is not without its limits; "courts

21

apply an 'economic reality' test" to "examine[] 'the totality of the circumstances to determine whether the individual [alleged to be an employer] has sufficient operational control over the workers in question and the allegedly violative actions'". Powell, 786 S.E.2d at 801 (quoting Garcia, 644 F. Supp. 2d at 720).

> Factors commonly relied on by courts in determining the extent of an individual's operational control over employees include whether the individual:  (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.

Id. (citing Garcia, 644 F. Supp. 2d at 721).  "These factors are not exclusive nor is any one factor dispositive." Id. (quoting Garcia, 644 F. Supp. 2d at 720).

Here, the "individual Defendants" are alleged to be employers "by virtue of the fact that they control the entity Defendant, including the compensation, payroll, pay, benefits, and other similar aspects of the entity Defendant." (Compl. ¶ 126.)  Not only are these allegations made elsewhere upon information and belief without factual support, but allegations related to any individual Wilson Defendant's employment of Marshall are limited.  It is alleged that Dustin (and Ritter) instructed Marshall to fire an African-American employee and that Marshall met with "Company owner Wilson" (and Ritter) about his belief that C&S was racist because it failed to address his complaints about Hensley. (Id. ¶¶ 14, 18.) But, neither these allegations nor any others plausibly state that any specific Wilson Defendant had the power to hire or fire Marshall, supervised or controlled his work schedules, determined his rate or method of pay, or maintained his

22

employment records.

On the other hand, <u>C&S</u> is alleged to have employed Marshall as a Field Manager, raised his annual salary, assigned mostly African-American employees to his crews, assigned Marshall to work with a mostly white crew at the New York job site, failed to take action to protect employees, and failed to pay Marshall all the hours he worked. (<u>Id.</u> ¶¶ 10, 11, 13, 15, 24, 25.) Reviewing the allegations associated with other Plaintiffs confirms that it is not plausibly alleged that any Wilson Defendant was Marshall's employer. (<u>Compare</u> <u>id.</u> ¶¶ 70, 71 (allegations of actions by Dustin and Jason) <u>with</u> <u>id.</u> ¶¶ 44, 51, 52, 54, 55, 62, 74, 76, 86 (allegations of actions by C&S). In sum, Marshall has not plausibly alleged that any Wilson Defendant was his employer for purposes of his NCWHA claim.

C.

Plaintiffs allege that the Wilson Defendants are liable for negligent retention and supervision of employees involved in the racist and abusive conduct. As above, though, the Wilson Defendants move to dismiss this claim against them because, they argue, Plaintiffs have not sufficiently alleged any Wilson Defendant is their employer. (Br. in Supp. at 14-15.) In addition, they argue that Plaintiffs' claim fails because they cannot rely on alleged violations of § 1981 as the predicate negligent act. (<u>Id.</u> at 15.) Plaintiffs respond that they have plausibly alleged other predicate torts – wrongful discharge in violation of public policy, assault, and conversion – as predicate acts. (Pls.' Opp'n at 17-19.) The Wilson Defendants take issue with these proposed predicate torts and note that Plaintiffs

23

did not address or dispute the contention that they have not sufficiently alleged any Wilson Defendant is their employer. (Reply Br. at 5 [Doc. #20].)

"North Carolina recognizes the existence of a claim against an employer for negligence in employing or retaining an employee whose wrongful conduct injures another." Hogan v. Forsyth Country Club. Co., 340 S.E.2d 116, 123 (N.C. Ct. App. 1986). A cause of action for negligent retention and supervision is a "tort based on the employer's liability to third parties" independent of liability based on the doctrine of respondeat superior. Smith v. Privette, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998) (citing Braswell v. Braswell, 410 S.E.2d 897, 903 (N.C. 1991)). An employer is liable for negligent retention and supervision when an "'incompetent employee committed a tortious act resulting in injury to plaintiff and that prior to the act, the employer knew or had reason to know of the employee's incompetency.'" Id. (quoting Graham v. Hardee's Food Sys., 465 S.E.2d 558, 560 (N.C. Ct. App. 1996)).

First, as to the Wilson Defendants' argument that Plaintiffs have once again failed to allege that the Wilson Defendants were their employers and that "Plaintiffs' negligent retention and supervision claims should [accordingly] be dismissed", (Br. in Supp. at 15), they have misconstrued this claim. While a claim for negligent retention and supervision must be brought against an employer as the Wilson Defendants argue, it does not need to be brought against the plaintiff's employer. Instead, it is brought against the employer of the tortfeasor. Therefore, whether Plaintiffs have alleged that any of the Wilson Defendants is their employer

24

matters not for a claim of negligent retention and supervision.

Next, as Plaintiffs recognize, while "[n]o North Carolina appellate court has expressly addressed whether a violation of . . . § 1981 qualifies as an underlying 'tortious act' for a negligent supervision or retention claim under North Carolina law", the Fourth Circuit Court of Appeals in <u>McLean v. Patten Cmtys., Inc.</u>, 332 F.3d 714 (2003), affirmed the district court's judgment dismissing the negligent retention and supervision claim because the underlying tort was an alleged violation of § 1981 rather than a common law tort.

Plaintiffs contend that they have plausibly alleged the common law torts of wrongful discharge in violation of public policy, conversion, and assault. (Pls.' Opp'n at 17-19.) Yet, the predicate tort for negligent retention and supervision must be committed by the employee, not the employer. <u>See</u> <u>Waddle v. Sparks</u>, 414 S.E.2d 22, 29 (N.C. 1992) ("An essential element of a claim for negligent retention of an employee is that the employee committed a tortious act resulting in plaintiffs' injuries.") Wrongful discharge and conversion are alleged, if at all, against C&S. As for assault, Plaintiffs cite to four specific paragraphs in the Complaint where they contend they have "repeatedly alleged that they were subjected to" assault.[2] (Pls.' Opp'n at 18 (citing Compl. ¶¶ 22, 25, 71, 83).) In those paragraphs, Marshall alleges that after he told Ritter about the threat to

---

[2] Although Plaintiffs have not alleged a cause of action for assault (or for conversion), they note that the Wilson Defendants have not cited any case law requiring the underlying tort to have been alleged as its own cause of action.

Walker, Henlsey texted Marshall, "can we go on a nigger hanging spree", (Compl. ¶ 22 (referring to Ex. 1 to Compl.)), and that C&S failed to pay him for all hours he worked, (id. ¶ 25); Adams alleges that "Wilson" denied African-American employees additional compensation for making the New York trip and Jason said the Company did not have to abide by its promises, (id. ¶ 71); and Plaintiffs allege that the "Wilson Defendants" "encouraged, assisted, and/or condoned" "the Company's racial discrimination", (id. ¶ 83). The Wilson Defendants reply that none of those paragraphs sufficiently allege assault and, even if they did, Plaintiffs have not alleged that the Wilson Defendants had notice or failed to act and caused Plaintiffs harm. (Reply Br. at 6-7.)

Plaintiffs assume North Carolina law applies to these purported assault allegations, and the Wilson Defendants do not appear to dispute that assumption. But, of the paragraphs Plaintiffs cite, the only one plausibly related to a potential assault is Marshall's allegation of Henlsey's text message to Marshall while Marshall's crew and presumably Marshall were in New York. This court is bound to apply North Carolina's choice of law rules to this claim. See, e.g., ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983). Nevertheless, the elements of assault under New York and North Carolina law are very similar. Compare, e.g., Gould v. Rempel, 951 N.Y.S.2d 677, 678 (N.Y. App. Div. 2012) (requiring a plaintiff to allege "intentional physical contact placing the plaintiff in imminent apprehension of harmful contact" and recognizing that "[w]hile an action for assault need not involve physical injury, but only a grievous affront or threat to

26

the person of the plaintiff, words, without some menacing gesture or act accompanying them, ordinarily will not be sufficient to state a cause of action alleging assault") (citations and quotations omitted) with Johnson v. Bollinger, 356 S.E.2d 378, 381 (N.C. Ct. App. 1987) (explaining that "[w]hile words alone may not constitute assault, words may render the actor liable if, in combination with other acts or circumstances, they put the other person in reasonable apprehension of an imminent harmful or offensive contact with his person") (citations and quotations omitted).

The allegations of Hensley's text message to Marshall do not plausibly allege assault under either state's law. Even if they did, there is no allegation that any specific Wilson Defendant was on notice of Hensley's assaultive behavior. Marshall alleges that on May 18, he "met with Company owner Wilson" to complain about the Company's racism when it failed to address his earlier complaint to Ritter about Henlsey's calling him "a big dummy" and use of "other racially offensive language". That behavior, though, does not plausibly place any Wilson Defendant on notice that Hensley would then assault Marshall.

Although not identified by Plaintiffs, the only other allegations that sound in assault are Walker's allegations that two Caucasian workers in a truck with him said, "We are going to have a David Walker hanging today" and "We are going to hang David today", (Compl. ¶ 30). However, there are no other contextual allegations surrounding the verbal threats to state plausibly an assault. And, there is no allegation that any specific Wilson Defendant was on notice of those

27

unidentified Caucasian workers' assaultive behavior.

In sum, no Plaintiff sufficiently alleges a claim for negligent retention and supervision against any Wilson Defendant.

D.

Defendants next seek to dismiss Plaintiffs' First Claim for Relief, "Race Discrimination – 42 U.S.C. § 1981", as duplicative of Plaintiffs' Third Claim for Relief, "Hostile Work Environment – 42 U.S.C. § 1981", and Fourth Claim for Relief, "Disparate Treatment/Discrimination – 42 U.S.C. § 1981". (Br. in Supp. at 15-16.) In response, Plaintiffs contrast their First Claim for Relief with the others as alleging "intentional discrimination under § 1981" separate from their claims for hostile work environment and disparate treatment. (Pls.' Opp'n at 19.) No party cites any case law in support of their argument.

In their First Claim for Relief for "Race Discrimination", Plaintiffs allege that

> Defendants discriminated against [them] on the basis of their race with respect to the terms, conditions and privileges of their employment by failing to pay them as much as similarly situated Caucasian employees, by segregating them according to race in job assignments and placements, and by facilitating, permitting and/or failing to address the racially hostile work environment [and that] [s]imilarly situated Caucasian employees . . . were not treated in the same manner.

(Compl. ¶ 92.) This claim alleges in a general sense the same conduct more specifically alleged in the claims of "Hostile Work Environment" and "Disparate Treatment/Discrimination" and does not allege additional unlawful conduct. It is, therefore, duplicative of the Third and Fourth Claims for Relief and is dismissed.

28

E.

Jones, Worthy, and Adams allege that C&S wrongfully discharged them in violation of North Carolina public policy as set out in N.C. Gen. Stat. § 143-422.2. C&S moves to dismiss the claim. First, the Company argues that "[t]o the extent" the "claims are based on retaliation", North Carolina's Equal Employment Practices Act ("EEPA") "does not articulate any North Carolina public policy against retaliation for complaining about [race] discrimination." (Br. in Supp. at 16-18.) Next, "[t]o the extent" the "claims are based on alleged race discrimination", C&S contends that neither Jones nor Adams alleges facts to support the assertion they were fired because of their race and Worthy does not allege discriminatory intent. (Id. at 18-20.) Jones, Worthy, and Adams respond that they have sufficiently alleged facts to show they were terminated because of their race in addition to retaliatory reasons. (Pls.' Opp'n at 20-22.)

North Carolina's EEPA codifies the state's public policy "to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race . . . ." N.C. Gen. Stat. § 143-422.2(a). Plaintiffs may bring a claim under this statute for "'common law wrongful discharge claims or in connection with other specific statutory remedies'" including a claim that the "separation may have been caused because of [the plaintiff's] race". McLean, 332 F.3d at 720 (quoting Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).

C&S contends that Jones' and Adams' wrongful discharge claim is based on

29

retaliation and, thus, not cognizable under § 143-422.2. The McLean court held "that there is no private right of action under North Carolina law for retaliation under" the statute. 332 F.3d at 719 (also acknowledging the holding in Smith that there is no private right of action under § 143-422.2 for sexual harassment). Also instructive, though, is that the court found cognizable the plaintiff's claim that she was discharged "for refusing to consent to the sexual advances of the employer" because that discharge was "on account of discrimination . . . because of sex". Id. at 720. "The distinguishing feature between the claim disallowed in Smith and the claim allowed in McLean is that the claim allowed in McLean alleged wrongful discharge because of the plaintiff's refusal of sexual favors to her supervisor, while the claim disallowed in Smith did not allege wrongful discharge, just sexual harassment." Townsend v. Shook, 323 F. App'x 245, 251 (4th Cir. 2009) (unpublished).

Jones and Adams have not asserted a claim for retaliation in violation of §143-422.2. Instead, they have alleged a claim for wrongful discharge in violation of the statute. Nevertheless, C&S argues that neither of them have alleged a "factual foundation" in support of their assertion that they were fired because of their race. (Br. in Supp. at 19.)

Jones alleges that he was fired in Alabama[3], and, "[u]pon information and

---

[3] Neither Jones nor C&S addresses whether Jones's firing in Alabama complicates his ability to bring a claim for wrongful discharge under North Carolina law, and there is insufficient information in the Complaint to make a determination.

belief, Ritter said he would teach him a lesson for trying to go by the book and/or opposing the racist treatment and disparate practices of those managers and the Company." (Compl. ¶ 51.)  However, Jones alleges no facts to support his belief about Ritter and, even had he done so, he alleges Ritter was going to act because Jones tried "to go by the book" or because he opposed race discrimination.  As for that opposition, Jones alleges he complained about the derogatory manner in which others spoke about their former supervisor Marshall on the job, Cox's and Gambles' unprofessionalism, and his "Caucasian co-workers' language, habits, and consorting together to avoid their work duties." (Id. ¶¶ 49-50.)  The complaints of derogatory comments about Marshall, Cox's and Gambles' unprofessionalism, and co-workers' habits and avoiding work are not plausibly race discrimination much less conduct directed at Jones such that his termination for complaining was because of his race.  His complaint about Caucasian co-workers' language presumably includes the comments Cody Lord's crew members made to him. Jones alleges that those "crew members were all young, white men, many of whom used racist language.  They called [him] 'you-n,' and referred to 'your kind.' When he asked what they meant, they told him they did not mean it 'like that; you know how you all say it, you-n say it.'" (Id. ¶ 48.)  Some words and terms – standing by themselves – are regarded as racially pejorative:  the "N" word, definitely, and "your kind", likely, being among them.  However, "you-n" has been used by persons in some areas similar to the way the terms "you all" and "y'all" have been used elsewhere.  A word search has not been helpful in ascribing a

racial or any other context to the term "you-n".  While "your kind" is likely pejorative, there is no context here, especially in light of Jones' inquiry of his co-workers and their response.  These allegations, without more, do not plausibly allege racially discriminatory conduct.  Therefore, Jones has not stated a claim for wrongful termination in violation of N.C. Gen. Stat. §143-422.2.

Adams alleges that C&S terminated her employment as retaliation "for taking FMLA-protected leave" and for "opposing the Company's unlawfully racist conduct." (Id. ¶¶ 74, 76, 79.)  The opposition that she alleges is her objection to the Company's segregation of employees and treatment of African-American employees. (Id. ¶ 68.)  As it relates to her, that treatment on account of race is her exclusion from manager meetings and scheduled company retreats. (Id. ¶ 72.)  She also alleges upon information and belief that she was paid less than Caucasian managers and similarly situated Caucasian employees, (id. ¶¶ 66-67, 69), but there are no facts to support her belief.  Recognizing at this stage that Adams may plead more than one reason for her termination, she has stated a wrongful discharge claim because she alleges that she was discharged for opposing racist conduct and treatment aimed toward her because of her race.

Although C&S acknowledges that Worthy affirmatively alleges he was terminated because of his race (rather than, as C&S argues, retaliation like Adams and Jones), the Company challenges the sufficiency of those allegations, namely the allegations of discriminatory intent. (Br. in Supp. at 18-20.)  C&S contends that Worthy does not allege direct evidence of discriminatory intent, his pretext

allegation shows he was actually fired because "he was incorrectly accused of driving without authority" rather than because he had an accident, and there are no similarly situated Caucasian employees who drove without authority and were treated differently than Worthy. (Id. at 19-20.)

C&S reads the allegations too narrowly and misses Worthy's allegations connecting his accident (rather than the mistaken assertion he operated the vehicle without authority) with his termination. Nevertheless, Worthy has not sufficiently alleged that he was terminated because of his race. He alleges that "[u]pon information and belief, if [he] were Caucasian, he would still have his job", (Compl. ¶ 64), but there are insufficient facts to support this belief. He alleges he "was fired following his accident as a direct result of the Company's pattern and practice of firing African American employees for incidents for which Defendants do not fire Cauca[sian] employees and because he complained about racist treatment and actions." (Id. ¶ 63.) First, there are no facts to support a pattern and practice of firing African-American employees for incidents for which Caucasian employees are not terminated. Worthy earlier alleges this disparate treatment upon information and belief only. (See id. ¶ 62.) Next, although he does not specifically identify the racist treatment and actions about which he allegedly complained that led to his termination, as it relates to him he did observe the segregation of crews, five Caucasian employees he trained refused to follow his orders or show him respect,

33

Caucasian employees referred to him as "'boy'" and "'you-n'"[4], and "Defendants and their supervisors treated [him] far worse than they treated Caucasian employees and set the example for other employees to mistreat him". (Id. ¶¶ 54-56, 58.) Not only is there insufficient factual support for the last allegation, but these allegations do not plausibly support a reasonable inference that Worthy was terminated because of his race in violation of §143-422.2.

F.

Plaintiffs have alleged against Defendants disparate treatment in violation of 42 U.S.C. § 1981. Defendants move to dismiss Worthy's claim "for the same reasons" they argue his wrongful discharge claim should be dismissed. (Br. in Supp. at 20.) Apparently, they are referring to their position that Worthy has alleged that "he was fired not because he had an accident, but rather because he was incorrectly accused of driving without authority", he "fails to make any allegation that similarly situated white employees who drove without authority were treated any differently than he was treated", and termination based "on a mistaken belief" is "insufficient to state a plausible claim of race discrimination." (Id. at 19-20.)

Although at first glance and as Defendants note in their reply it does not appear as though Worthy disputed Defendants' position, he did respond in a footnote as part of his wrongful discharge response and contends he has

_____

[4] See pages 31-32 for an explanation of the insufficiency of a similar allegation Jones made of being called "'you-n'".

34

sufficiently alleged disparate treatment. (Ps.' Opp'n at 21 n.1.)  He argues that he alleged "that, after he had an accident in a faulty truck that was specifically provided to him because of his race, he was terminated based on a false allegation and under circumstances in which Caucasian employees were not terminated." (Id. at 21.)  However, in support of that statement, Worthy cites to paragraphs 55 and 56, neither of which relates to the circumstances of his termination. (See Compl. ¶ 55 (alleging that he trained at least five Caucasian employees who were disrespectful to him and were moved to all-Caucasian crews) ¶ 56 (alleging that Caucasian employees referred to him as "'boy'" and "'you-n'").)

A plaintiff alleges disparate treatment in violation of § 1981 when he alleges that he is a member of a protected class, has suffered an adverse employment action, was meeting his employer's legitimate job expectations, and the circumstances of the adverse employment action "give rise to an inference of unlawful discrimination." Alexander, 762 F. Supp. 2d at 792.

As explained above, the Wilson Defendants are dismissed from this claim, leaving only C&S.  To the extent that Worthy relies on his allegation that he was terminated under circumstances in which Caucasian employees were not, he has not alleged sufficient facts.  First, as noted above, in the Complaint Worthy connects his termination with his accident, not with the mistake about his authority to operate the vehicle.  Next, though, it matters not whether he alleges he was terminated "based on a false allegation" as he argues or "following his accident" as he alleges because there are insufficient facts as to either to state a

35

disparate treatment claim. He alleges "[o]n information and belief" that "C&S did not fire Caucasian employees who had accidents", (Compl. ¶ 62), but there are not facts to support that belief. He alleges that his termination after his accident was "a direct result of the Company's pattern and practice of firing African American employees for incidents for which Defendants do not fire Cauca[sian] employees", (id. ¶ 63), but he does not support this conclusory allegation with facts. Finally, to the extent that Worthy intends to rely on the allegations in paragraphs 55 and 56 about his training of Caucasian employees who were disrespectful and moved to all-Caucasian crews and Caucasian employees calling him "'boy'" and "'you-n'", these allegations do not support a disparate treatment claim either.

G.

Plaintiffs have also alleged that Defendants retaliated against them in violation of 42 U.S.C. § 1981. Defendants move to dismiss Walker's, Worthy's, and Adams' § 1981 retaliation claim. (Br. in Supp. at 20-23.) As previously noted, the Wilson Defendants are dismissed from this claim. And in response to Defendants' challenge, Walker "withdr[ew]" his retaliation claim. (Pls.' Opp'n at 22 n.2.) As for Worthy and Adams, Defendants concede that they allege protected activity and adverse action but challenge the sufficiency of Worthy's allegations of actors' identities, dates of incidents, and retaliatory intent and of Adams' allegations of the date of discharge and retaliatory intent. (Br. in Supp. at 22-23.) Worthy and Adams dispute the necessity of alleging specific dates at this stage and argue that they "have stated claims for retaliation based on far more than

36

'temporal proximity alone.'" (Pls.' Opp'n at 22-23.)

"[T]o state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action." <u>Ali v. BC Architects Eng'rs, PLC</u>, 832 F. App'x 167, 172-73 (4th Cir. 2020) (unpublished) (citing <u>Guessous v. Fairview Prop. Invs., LLC</u>, 828 F.3d 208, 217-18 (4th Cir. 2016)).

Worthy alleges that he worked for C&S "on and off . . . over five years", that he "complained about the segregation and treatment of African American employees" and he was terminated following his accident in retaliation for complaining "about racist treatment and actions." (Compl. ¶¶ 53, 59, 61, 63.) These allegations are insufficient to state a plausible inference of causation. It cannot be inferred when these events took place in relation to each other or who was involved other than Worthy.

Adams alleges that she worked for C&S and its predecessor for seventeen years, she "objected" to the Company's racial segregation of employees and treatment of African-American employees, she reported presumably "[i]n or about February 2018" to Dustin Wilson threats made to two African-Americans on her crew, she complained presumably to Jason Wilson when an African-American crew was denied the promised additional compensation for working in New York, she was excluded from manager meetings and company retreats, she suffered a serious health condition, and she was terminated "once [C&S] claimed her FMLA leave had expired" in retaliation for taking FMLA-protected leave and because she

37

opposed the Company's "unlawfully racist policies". (Id. ¶¶ 66, 68, 70-74, 79.) As above, these allegations do not support a plausible inference of causation. Other than the reference to threats made to her crew in or about February 2018, it cannot be inferred when these events took place in relation to each other and there are no other facts that plausibly allege causation between protected activity and adverse action.

### H.

Adams alleges that C&S violated the FMLA by interfering with her rights under the Act and retaliating against her for exercising those rights. C&S challenges her interference claim because she does not allege that "she was ready, able, and willing to return to work after the exhaustion of her FMLA leave" and employers are not required "to reinstate employees who remain out on leave after exhausting their FMLA leave." (Br. in Supp. at 23.) Adams responds by citing to her allegation that C&S "violated the FMLA by failing and refusing to permit [her] to take all of the leave that she was entitled to under the FMLA . . . ." (Pls.' Opp'n at 24.). But, C&S argues that her earlier factual allegations "make clear that the leave to which she claims entitlement was additional unpaid leave after her FMLA leave expired." (Reply Br. at 12 (citing Compl. ¶¶ 75, 76).)

As for her retaliation claim, C&S does not believe she has sufficiently alleged causation because she alleges she was terminated after she did not return to work and as a result of the Company's anger towards her for complaining about "racist practices". (Br. in Supp. at 25.) Adams contends that C&S "misreads [her]

38

allegations" and it matters not that she alleged "she was terminated both in violation of Section 1981 and the FMLA." (Pls.' Opp'n at 24-25 (citing Compl. ¶¶ 70-78).) C&S stands by its contention that Adams has alleged she was discriminated against because of her race, not for taking FMLA leave. (Reply Br. at 13.)

The FMLA entitles eligible employees "to a total of 12 workweeks of leave during any 12-month period" for, among other reasons, "a serious health condition that makes the employee unable to perform" her job functions. 29 U.S.C. § 2612(a)(1)(D). "[O]n return from such leave", the employee "shall be entitled . . . to be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). The Act prohibits an employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise" rights under the Act and from "discharg[ing] or in any other manner discriminat[ing] against an individual for opposing any practice made unlawful" under the Act. 29 U.S.C. § 2615(a).

To state an interference claim, a plaintiff must allege that she "is entitled to an FMLA benefit", her "employer interfered with the provision of that benefit", and "that interference caused harm." Adams v. Anne Arundel Cty. Pub. Sch., 789 F.3d 422, 427 (4th Cir. 2015). "Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but

39

discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). Although Adams alleges that C&S did not extend her non-FMLA leave, she also alleges that she "was entitled to unpaid leave under the FMLA . . . and on information and belief, C & S approved some unpaid leave for [her] and classified it as such" but that C&S "fail[ed] and refus[ed] to permit [her] to take all of the leave that she was entitled to under the FMLA". (Compl. ¶¶ 75, 76, 139, 140.) In sum, she has sufficiently alleged that C&S interfered with her FMLA rights when it did not allow her to take the FMLA leave to which she was entitled.

A plaintiff states a claim for retaliation in violation of the FMLA when she plausibly alleges that "she engaged in a protected activity", "her employer took an adverse employment action against her", and "there was a causal link between the two events." Adams, 789 F.3d at 429 (internal quotations omitted). Adams alleges upon information and belief that C&S "executives were angry at [her] . . . because [she] took FMLA leave to deal with the mental anguish that the Company's conduct had caused her", (Compl. ¶ 78), but she does not allege facts to support that belief. Likewise she does not sufficiently allege facts to support her allegations that "the Company was actively trying to get rid of her because she had complained about and opposed the Company's racist conduct and treatment", (id. ¶ 76), or "the Company retaliated against her for exercising her rights under the FMLA", (id. ¶ 79; see also id. ¶ 140). Although Adams sufficiently alleges an interference claim in violation of the FMLA, she has not sufficiently alleged a retaliation claim.

40

IV.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY

ORDERED that Defendants' Motion for Partial Dismissal [Doc. #14] is GRANTED IN

PART AND DENIED IN PART as follows:

1. GRANTED as to all claims against the Wilson Defendants;

2. GRANTED as to the First Claim for Relief (§ 1981 discrimination);

3. GRANTED IN PART as to Jones's and Worthy's Second Claim for Relief
   (wrongful discharge) and DENIED IN PART as to Adams' Second Claim for
   Relief (wrongful discharge);

4. GRANTED as to Worthy's Fourth Claim for Relief (§ 1981 disparate
   treatment);

5. GRANTED as to Walker's, Worthy's, and Adams' Fifth Claim for Relief
   (§ 1981 retaliation); and

6. GRANTED IN PART as to the Eighth Claim for Relief (FMLA retaliation) and
   DENIED IN PART as to the Eighth Claim for Relief (FMLA interference).


This the 9th day of April, 2021.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

Case 1:19-cv-00986-NCT-JEP   Document 22   Filed 04/09/21   Page 41 of 41