IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

AUBREY MARSHALL, DAVID )
WALKER, RICKY LEE JONES, JR., )
AUTWAIN WORTHY, AND APRIL )
ADAMS, )
 )
               Plaintiffs, )     1:19CV986
   v. )
 )
C & S RAIL SERVICES, LLC, )
 )
               Defendant. )

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant C & S Rail Services, LLC's Motion for Partial Judgment on the Pleadings [Doc. #32]. After Defendants'[1] partial motion to dismiss was granted in part and denied in part, Plaintiffs filed an Amended Complaint against C & S Rail Services, LLC ("C & S"). C & S now moves to dismiss the claim of a hostile work environment in violation of 42 U.S.C. § 1981 asserted by Plaintiffs Ricky Lee Jones, Jr. and Autwain Worthy. For the reasons explained below, the motion is granted.

I.

As alleged in the Amended Complaint, Jones and Worthy are African Americans and, at the relevant times, were employed by C & S. (Am. Compl. ¶¶ 3, 4, 33, 50 [Doc. #30].) Jones was employed as a dump truck driver "on and off"

---

[1] In their initial Complaint, Plaintiffs asserted claims against C & S Rail Services, LLC and three individual defendants. The claims against the individual defendants have now been dismissed.

"beginning in approximately early 2017" and was hired in February 2018 by Plaintiff Aubrey Marshall to work on his crew in Georgia. (Id. ¶¶ 33, 34.) "During the course of his employment", Jones "was treated poorly by many C & S employees" including by Operations Manager Tim Ritter who told Mr. Jones that Mr. Marshall should not have hired Jones and he did not like either of them. (Id. ¶¶ 11, 36.) Ritter also "repeatedly cursed at and spoke harshly to . . . and made unreasonable demands of" Jones. (Id. ¶ 37.) "For example, he once told him he better get his 'ass' in the truck" and immediately drive from Kentucky to Tennessee or he would be fired, but Ritter knew the truck was faulty and without working lights. (Id.) "Upon information and belief, Mr. Ritter did not direct similar offensive language or unreasonable demands toward the white employees." (Id.)

On another occasion, "C & S managers" told Jones they needed to repair his truck, which was "a well-functioning dump truck" with air conditioning. (Id. ¶ 40.) Instead of repairing the truck, managers gave it to Dustin Gambles[2], a Caucasian co-worker, who had told Jones he wanted it. (Id.) In exchange, managers supplied Jones with a truck they said was "'new'" – a 1998 model "in very poor condition" "that was leaking asphalt and had no air conditioning." (Id.) C & S "repeatedly denied . . . Jones the proper equipment he needed to perform his job duties while providing the Caucasian employees with such equipment." (Id. ¶ 44.)

---

[2] C & S notes in its Answer that Dustin's last name is Grumbles. (Answer to Am. Compl. ¶ 39 [Doc. #31].)

In addition, his supervisor Dylan Cox, who is Caucasian, made him "do extra work without remuneration" on the mornings after Cox and Gambles would go out together late into the night. (Id. ¶ 39.)

When Jones requested a raise after he completed his probationary period of employment, managers ignored the request. (Id. ¶ 42.) Yet, they asked him "to drive a combination, a trailer hooked up to a dump truck, which is more difficult and riskier, while they asked Mr. Gambles to drive only a dump truck and paid him a higher wage." (Id.; see id. ¶ 41 (alleging Jones was paid $16 or $17 per hour while, on information and belief, Gambles was paid over $20 per hour).)

"At some point", Jones was the only African American on Cox's crew. (Id. ¶ 44.) The white employees, who did not have a commercial driver's license, "repeatedly told . . . Jones [who did have a commercial driver's license] what to do and questioned his credentials." (Id.)

White crew members called Jones "'you-n,' and referred to 'your kind.'" (Id. ¶ 45.) He asked what they meant, and "they told him they did not mean it 'like that; you know how you all say it, you-n say it.'" (Id.) Jones saw white employees "disrespect and badmouth" Worthy "when he was training them". (Id. ¶ 38.) Jones complained about employees talking about their former supervisor "Marshall in a derogatory manner" after Marshall left C & S, and he told Cox and Gambles that the employees "were not acting professionally." (Id. ¶ 46.) He also "complained to C & S management about white co-workers' language, habits, and consorting to avoid their work duties." (Id. ¶ 47.)

3

Jones was fired in July 2018. (Id. ¶ 48.) "Upon information and belief, . . . Ritter said he would teach him a lesson for trying to go by the book or opposing the racist treatment and disparate practices of those managers and the Company." (Id.) Meanwhile, "[o]n information and belief, C & S made Mr. Gambles, who . . . has little experience, a supervisor." (Id. ¶ 49.)[3]

Worthy worked at C & S "on and off" over a five-year period as a driver, laborer, and ground foreman. (Id. ¶ 50.) He observed that C & S segregated African American employees and Caucasian employees on different teams and treated them differently. (Id. ¶¶ 51, 54.) "For example, the Caucasian employees were allowed to go to a nearby store to use the bathroom" but "when the African American employees needed to go, the supervisors complained and discouraged them from leaving the job site." (Id. ¶ 54.)

"When segregated teams had to work together on a job, Operator David Skeens spoke harshly to the black employees and called them 'y'all boys' while referring to the Caucasian employees as 'men.'" (Id.) Caucasian employees referred to Worthy and other African American employees as "'boy' and 'you-n'", and he heard them "curs[e] at and us[e] harsh and abusive language towards the African American employees." (Id. ¶ 53.) Worthy trained Caucasian employees who would "frequently refuse[] to follow his orders or show him respect based on his race." (Id. ¶ 52.) He "complained ['to Defendant'] about the segregation and

---

[3] C & S admits that Grumbles became a manager. (Answer to Am. Compl. ¶ 49.)

4

treatment of African American employees" "but nothing was done to remediate the issues." (Id. ¶ 56.)

After fifteen years of accident-free work in railroad vehicles, Worthy had an accident "in a faulty truck" that "[u]pon information and belief" "C & S managers knew" "needed maintenance and was not fully inspected" yet they "assigned" it to Worthy anyway. (Id. ¶¶ 57, 58.) "C & S managers incorrectly claimed" Worthy did not have "the authority to use the vehicle." (Id. ¶ 58.) He was fired following the accident, but "[o]n information and belief, C & S did not fire Caucasian employees who had accidents." (Id. ¶¶ 59, 60.)

II.

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." A court considering a motion for judgment on the pleadings must "view the facts presented in the pleadings and inferences drawn therefrom in the light most favorable to the non-moving party." Atwater ex rel. Estate of Peterson v. Nortel Networks, Inc., 394 F. Supp. 2d 730, 731 (M.D.N.C. 2005) (citing Edwards v. City of Goldsboro, 178 F.3d 231, 248 (4th Cir. 1999)).

A motion pursuant to Rule 12(c) is analyzed under the same standard as a Rule 12(b)(6) motion to dismiss. Massey v. Ojaniit, 759 F.3d 343, 347 (4th Cir. 2014). Therefore, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544,

5

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014). Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level". Id. at 555.

When analyzing a Rule 12(c) motion, a court also considers the answer. See Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Massey,

6

759 F.3d at 347.  However, "[t]he factual allegations of the Answer are taken as true only where and to the extent they have not been denied or do not conflict with the complaint." Alexander v. City of Greensboro, No. 1:09-CV-293, 2011 WL 3360644, at *2 (M.D.N.C. Aug. 3, 2011).  Because a plaintiff is not required to respond to allegations in an answer and those allegations are deemed denied, a defendant cannot rely on allegations contained only in the answer to support its motion. Id.

III.

Both Jones and Worthy have asserted a claim of a hostile work environment in violation of 42 U.S.C. § 1981.  Title 42 U.S.C. § 1981 provides that

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens and shall be subjected to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1981 "guards generally against race-based discrimination in the workplace." Lemon v. Myers Bigel, P.A., 985 F.3d 392, 399 (4th Cir. 2021).

A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment". Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  To state a claim for a hostile work environment because of race, a "plaintiff must allege workplace harassment that

7

(1) was unwelcome; (2) was based on the employee's [race]; (3) was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) was, on some basis, imputable to the employer." Parker v. Reema Consulting Servs. Inc., 915 F.3d 297, 302 (4th Cir. 2019) (assessing sufficiency of allegations of a hostile work environment in violation of Title VII) (internal quotations omitted); see Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (4th Cir. 2015) ("The same test applies to a hostile work environment claim asserted under 42 U.S.C. § 1981."). C & S challenges the sufficiency of the allegations in support of the third and fourth elements.

A.

1.

"To be actionable, the [unwelcome] conduct [based on race] must create an objectively hostile or abusive work environment, and the victim must also perceive the environment to be abusive." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001); see also Boyer-Liberto, 786 F.3d at 277 ("Whether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).

The severity or pervasiveness of unwelcome conduct based on race "can only be determined by examining the totality of the circumstances." Spriggs, 242 F.3d at 184 (citing Harris, 510 U.S. at 23). This "'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

8

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). "[V]iable hostile work environment claims often involve repeated conduct" but "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" Boyer-Liberto, 786 F.3d at 277 (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-17 (2002); quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Nevertheless, "'mere utterance of an . . . epithet which engenders offensive feelings in an employee'" and "'simple teasing [and] offhand comments'" "'do[] not sufficiently affect the conditions of employment to implicate [§ 1981].'" Id. (quoting Harris, 510 U.S. at 21; Faragher, 524 U.S. at 788). Said differently, incidents that cause "bruised or wounded feelings", "rude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor" are insufficient. Perkins v. Int'l Paper Co., 936 F.3d 196, 208 (4th Cir. 2019) (alterations in original).

Furthermore, although "the primary focus in the hostile work environment analysis is on the plaintiff's experience, evidence of how others were treated in the same workplace can be relevant to a hostile work environment claim." Id. at 209-10. Therefore, "racially offensive conduct and statements of which [the plaintiff] was aware" can be considered when assessing whether conduct was severe or pervasive "because the environment an employee experiences would, in addition to

9

his own treatment, include information he obtains about similar treatment of others even if he did not witness that treatment." Id. at 209, 210; see also Spriggs, 242 F.3d at 184 (citing Walker v. Ford Motor Co., 684 F.2d 1355, 1359 n.2 (11th Cir. 1982) ("The fact that many of the epithets were not directed at [the plaintiff] is not determinative. The offensive language often was used in [his] presence."); Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987) ("[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of general work atmosphere therefore – as well as evidence of specific hostility directed toward the plaintiff – is an important factor in evaluating the claim."). However, "experiences of third parties about which a plaintiff was unaware should not be considered in evaluating a hostile work environment's severe or pervasive requirement." Perkins, 936 F.3d at 210.[4]

In addition to the conduct itself, "the status of the harasser may be a significant factor – e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals" because "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." Boyer-Liberto, 786 F.3d at 278 (internal quotations omitted).

---

[4] Although experiences of others about which the plaintiff is unaware are not considered when assessing the severity or pervasiveness of conduct, they "may be relevant to other issues such as whether the alleged conduct was on account of . . . race." Perkins, at 210 n.7 (citing King v. McMillan, 594 F.3d 301, 310-11 (4th Cir. 2010)).

10

2.

Next, "to survive a Rule 12(b)(6) motion to dismiss, an employee must allege sufficient facts to plausibly satisfy the imputability requirement." Bazemore v. Best Buy, 957 F.3d 195, 201 (4th Cir. 2020). The court's "analysis of the imputability requirement is informed by the status of the alleged harasser." Id. If the harasser is a co-worker, the employer may be liable if it "knew, or should have known, about the harassment and failed to take action reasonably calculated to stop it." Id.; see also Vance v. Ball State Univ., 570 U.S. 421, 427 (2013) (recognizing that the Court has "held that an employer is directly liable for an employee's unlawful harassment if the employer was negligent with respect to the offensive behavior" and that "[c]ourts have generally applied this rule to evaluate employer liability when a co-worker harasses the plaintiff").

On the other hand, if the harasser is a supervisor, "different rules apply". Vance, 570 U.S. at 428. A supervisor is someone "the employer has empowered . . . to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. at 431 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)); see also id. at 439-40 (recognizing that while co-workers are able to "inflict psychological injuries" they cannot "dock another's pay" or "demote another" co-worker).

When the harassment involves a supervisor who takes a tangible employment action against the victim, the employer is strictly liable. Id. at 428-29. However, "even when a supervisor's harassment does not culminate in a tangible employment action, the employer can be vicariously liable for the supervisor's creation of a hostile work environment if the employer is unable to establish an affirmative defense" by showing "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." Id. at 430 (citing Faragher 524 U.S. at 807; Ellerth, 524 U.S. at 765).

B.

C & S contends that neither Jones nor Worthy has sufficiently alleged severe or pervasive conduct because they cannot rely on incidents about which they were unaware during their employment and they have not otherwise alleged much more than rude or insensitive behavior. (Def. C&S Rail Servs.' Br. in Supp. of its Mot. for Partial J. on the Pleadings ("Br. in Supp.") at 9-15 [Doc. #33].) C & S also challenges the sufficiency of the alleged facts to impute liability to the company. (Id. at 15-16.) According to C & S, Jones does not allege that conduct by Ritter or Cox culminated in tangible employment action and that his alleged complaint about co-workers does not "plausibly support[] an inference that C&S Rail knew or should have known of the alleged harassment of Jones . . . ." (Id. at 15-16.) And, C & S contends that Worthy similarly does not allege sufficient facts "to show that C&S Rail knew, or should have known, about any alleged

12

harassment of Worthy by his co-workers and failed to take action reasonably calculated to stop that alleged conduct." (Id. at 16.)

1.

In their response brief, Jones and Worthy take liberty with the allegations, Jones includes others' experiences about which he does not allege he was aware during his employment, and they overlook the obvious differences between their work experiences and those of the plaintiffs in the cases they cite. (Pls.' Opp'n to Def.'s Mot. for Partial J. on the Pleadings ("Br. in Opp'n") at 2-13 [Doc. #38]. Compare id. with Am. Compl. ¶¶ 18, 25, 27, 28, 34, 43, 48.) However, setting all of that aside, each of them has sufficiently alleged a hostile work environment.

2.

The trouble is that their allegations in support of imputing liability to C & S for that conduct fall short. Jones and Worthy disagree.

a.

As he did elsewhere in his brief, Jones attempts to persuade the Court of the sufficiency of his allegations by including allegations that do not, nor could they, involve Jones. He contends that he "complained to the Company about his co-workers' racist language", and "Marshall complained that a co-worker threatened to go on a 'nigger hanging spree' and that, as a result, the African American members of his crew, including Jones, were afraid." (Br. in Opp'n at 14 (citing Am. Compl. ¶¶ 20, 45, 47, 48).) According to Jones, "[t]he Company failed to take action to protect their African American employees." (Id. (citing Am.

13

Compl. ¶ 20).) He also relies on generalized allegations about the Company's treatment of African American employees. (Id. at 15-16 (discussing, for example, "a pattern and practice of segregating crews by race", Dustin Wilson's responsibility "for directing, promoting, and encouraging the discrimination and disparate racial treatment", and the Company's paying African American employees less).)

However, Jones does not allege that he complained about racist language; he "complained to C & S management about white co-workers' language, habits, and consorting to avoid their work duties." In addition, Jones was hired for Marshall's Georgia crew, but the hanging threats were made to David Walker on Marshall's New York crew and Jones does not allege that he knew of those threats during his employment. In sum, Jones does not allege to whom in C & S management he complained, but more important, he does not allege that he reported any racially hostile conduct directed at him or about which he was aware during his employment. Therefore, he has not sufficiently alleged that C & S knew or should have known about the co-worker harassment he experienced.

In addition to co-workers' alleged harassment, though, Jones also alleges harassment by Ritter and Cox who, at this stage, are plausibly alleged to be Jones's supervisors. (Am. Compl. ¶ 11 (alleging that Ritter has the authority to direct the firing of employees), ¶ 39 (alleging that Cox required Jones to do extra

work without pay).) Therefore, C & S is vicariously liable for any severe or pervasive conduct on their part.[5]

However, their alleged conduct is neither severe nor pervasive. Ritter told Jones that he did not like Marshall or Jones and that Jones should not have been hired. (Am. Compl. ¶ 36.) Although Ritter "repeatedly cursed at and spoke harshly to Plaintiff Jones", (id. ¶ 37), Jones does not allege what Ritter said or the circumstances surrounding that behavior. Ritter "once" demanded that Jones "get his 'ass' in the truck, even though Ritter knew the truck was faulty and without working lights, and immediately travel from Kentucky to Tennessee, or he would be fired." (Id.) But, no other incidents are alleged. Cox made Jones "do extra work without remuneration" on mornings after Cox and Gambles had been out drinking and gambling together. (Id. ¶ 39.) But, Jones does not allege how often this occurred or provide any further context. These allegations are not sufficient to show severe or pervasive conduct based on race.

Furthermore, the generalized allegations of C & S's treatment of African American employees upon which Jones relies in his brief are not sufficiently connected to him to impute liability to C & S.

---

[5] An employer is strictly liable for a supervisor's severe or pervasive conduct if tangible employment action results. Even if there is no resulting tangible employment action, the employer is liable if it cannot show the affirmative defense recognized in Faragher and Ellerth. Because this is a motion for judgment on the pleadings, such an affirmative defense is not before the Court. Therefore, at this stage, Jones only needs to plead severe or pervasive conduct on the part of a supervisor.

15

Therefore, because the conduct about which C & S is deemed to be aware is not severe or pervasive, Jones has not sufficiently pled a hostile work environment claim against C & S.

b.

Worthy argues that "supervisor David Skeens participated in the hostile work environment . . . [that] culminated in his termination" and, "[t]herefore, the Company is 'strictly liable'". (Br. in Opp'n at 15 (citing Am. Compl. ¶¶ 54, 60).) In addition, he relies on his allegation that he "'complained about the segregation and treatment of the African American employees to Defendant, but nothing was done to remediate the issues.'" (Id.) And, as did Jones, Worthy describes generalized allegations about the Company's treatment of African American employees. (Id. at 15-16.)

As for his co-workers' conduct, Worthy alleges that he "complained about the segregation and treatment of African American employees to Defendant, but nothing was done to remediate the issues." (Am. Compl. ¶ 56.) However, he fails to allege to whom he complained, as "Defendant" is simply too vague to attribute knowledge to C & S. More important, though, he does not provide facts describing the treatment about which he complained from which it would be reasonable to infer C & S knew or should have known about co-workers' racially hostile conduct directed towards Worthy or about which he was aware at the time.

That leaves David Skeens' conduct. Worthy alleges that he observed Skeens speak "harshly to black employees and call[] them 'y'all boys' while

16

referring to the Caucasian employees as 'men'" "[w]hen segregated teams had to work together on a job". (Id. ¶ 54.) Whether Worthy has sufficiently alleged facts supporting Skeens' supervisory position is a close question. He is alleged to have supervised another plaintiff (David Walker) and to have "led" a crew as a "manager", (id. ¶¶ 30, 67), but he is not alleged to have had the authority to take tangible employment actions against anyone. See Vance, 570 U.S. at 432 (explaining that neither the Ellerth nor the Faragher Court "had in mind" a category of supervisor who lacked the power to make tangible employment decisions but "nevertheless ha[d] the ability to direct a co-worker's labor to some ill-defined degree"). Therefore, Worthy has not plausibly alleged that Skeens is a supervisor as the Supreme Court has defined the term.

Even if Skeens were sufficiently alleged to be a supervisor, his discriminatory conduct is not severe or pervasive. For example, Worthy has not alleged how often he observed Skeens speaking harshly to African American employees and calling them "y'all boys" while referring to Caucasian employees as "men". Although one extremely serious incident of harassment may be sufficiently severe, this incident, no matter how humiliating or offensive, is not extremely serious. Compare Am. Compl. ¶ 54 with Boyer-Liberto, 786 F.3d at 280, 285 (finding at summary judgment that a reasonable jury could conclude that two uses of "porch monkey", "a racial epithet that is not just humiliating, but 'degrading and humiliating in the extreme'" in that it "is about as odious as the use of the word 'nigger'", are sufficiently severe to create a hostile work environment) and White

17

v. BFI Waste Servs., LLC, 375 F.3d 288, 297 (4th Cir. 2004) (finding at summary judgment that a reasonable jury could conclude that that White suffered "sufficiently severe or pervasive" harassment when "throughout his employment at BFI, supervisors repeatedly called him and other black employees 'boy, jigaboo, nigger, porch monkey, Mighty Joe Young, and 'Zulu warrior'" and "supervisors used the term 'boy' on a daily basis to refer only to black employees and not to white ones"). Therefore, even if C & S can be considered to know of Skeens' conduct as a supervisor, that conduct is not severe or pervasive.

As with Jones, the generalized allegations about the company's treatment of African American employees upon which Worthy relies in his brief lack a sufficient connection to Worthy to impute liability to C & S.

Therefore, because any conduct of which C & S is deemed to be aware is not severe or pervasive, Worthy has not sufficiently alleged a hostile work environment claim against C & S.

IV.

For the reasons explained in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant's Motion for Partial Judgment on the Pleadings [Doc. #32] is GRANTED.

This the 22nd day of February, 2022.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge